## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| NATIONAL DRYING TECHNOLOGIES, LLC,<br><br>*Plaintiff,*<br><br>v.<br><br>MITNOR CORPORATION,<br><br>*Defendant.* | **Case No. 1:22-cv-409**<br><br>**BENCH TRIAL REQUESTED** |

### COMPLAINT

Plaintiff National Drying Technologies, LLC ("NDT" or "Plaintiff"), by and through its undersigned counsel, as and for its Complaint against Defendant Mitnor Corporation ("Mitnor" or "Defendant") alleges as follows:

### INTRODUCTION

1.      This action arises out of Mitnor's clear breach of contract for non-payment, and other surrounding misconduct, under its Rate and Service Agreements, as most recently modified, August 28, 2020.

2.      Specifically, Mitnor has failed to pay NDT the principal sum of $3,847,560.99 for leasing of drying equipment and attendant services provided in connection with demolition and/or dry-out and mitigation of water damage to a variety of properties.

3.      Mitnor further owes NDT in excess of $2.475 million on its open account balances in accrued interest at the contracts' 1.5% monthly rate; as well as certain costs

and fees that continue to accrue.

4.     Despite its clear obligations, Mitnor flouts the plain language of the contracts, failing to meaningfully respond to the notices, demands and other efforts of compliance by or on behalf of Plaintiff. Rather than pay the amounts clearly owed, Mitnor has engaged in a series of protracted communications and obfuscation, intimating the possibility of payment and informational clarifications, which never came.

5.     Moreover, Mitnor has been unjustly enriched and breached its implied covenant of good faith and fair dealing, by, among other things, invoicing and improperly retaining certain of the payments made by its customers for the equipment and services NDT provided at Mitnor's request and direction.

6.     Mitnor's surrounding misconduct belies the parties' reasonable expectations of the contracts at the time of execution, including the express terms, agreed-upon common purpose, as well as "common standards of decency, fairness and reasonableness."

7.     Accordingly, NDT has brought claims against Mitnor for breach of contract, breach of implied covenant of good faith and fair dealing, action on account stated, unjust enrichment, and promissory estoppel, seeking the principal amounts owed, plus the substantial interest, costs and fees accrued, and continuing to accrue, in connection therewith.

## PARTIES, JURISDICTION AND VENUE

8.     Plaintiff, National Drying Technologies, LLC ("NDT") is a Kansas limited

liability company, with *no* members residing in New Hampshire.

9.     Defendant, Mitnor Corporation *d/b/a* "Servpro of the Seacoast" ("Mitnor"), *a/k/a* "Servpro Robbins Global" *a/k/a* "Servpro of D.R.S.," is a New Hampshire Corporation, with a principal place of business located at 74 Industrial Park Road, #1, Dover, New Hampshire.

10.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a) because the matter in controversy exceeds $75,000 exclusive of interest and costs, and complete diversity exists between the parties.

11.     This Court has personal jurisdiction over Defendant because Mitnor is a resident of the State of New Hampshire. Moreover, Defendant does substantial business throughout the state, relevant facts giving rise to the action occurred in the state, and Defendant's relevant contacts in New Hampshire made it foreseeable that it would be hauled into a New Hampshire court. *See, e.g., Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985).

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Mitnor is a resident in this District, a substantial part of the events or omissions giving rise to the conduct as alleged herein occurred in, were directed to, and/or emanated from this District.

## FACTUAL ALLEGATIONS

13.     NDT leases equipment with attendant materials, fuel, and services, and including technicians to general contractors and subcontractors involved in the demolition and/or dry-out of homes and buildings that have been damaged by a water

event generally covered by insurance.

14.     Mitnor acts as a general contractor on demolition/dry-out projects that have been damaged by a water event.

15.     Mitnor is a franchisee of Servpro Industries, LLC, "Servpro" and has a license to operate the business under that brand in Dover, New Hampshire and surrounding areas.

16.     Mitnor has also qualified for and participates in a program with Servpro that in the event of large scale, major insurance covered casualties serviced by Servpro that Mitnor may be referred projects out-of-state under short notice and with limited information and resources (particularly, without equipment) then available to produce the job.

17.     Mitnor is a long-standing customer of NDT since at least 2018 – NDT has furnished equipment, materials, goods, and related services to Mitnor on numerous occasions upon an open account with NDT held by Mitnor.

18.      Starting in 2018, NDT invoiced Mitnor on that open account per a "Rate and Service Agreement" that was requested and sent to Mitnor's owner, Mr. Tim Robbins, on or about October 10, 2018. A true and correct copy of the email communication memorializing the exchange of the Rate and Service Agreement, with that agreement, are hereby incorporated and included as "**Exhibit 1**."

19.     On or about August 28, 2020, the parties' modified the Rate and Service Agreement under which Mitnor's open account was being billed, by executing a second "Service Agreement" with an updated 2020 pricing rate sheet. A true and correct copy

of that second Service Agreement with the updated, 2020 pricing, is attached as "**Exhibit 2**" and incorporated by this reference.

20.     In September 2018, Hurricane Florence caused substantial water damage across the Carolinas.

21.     Mitnor was referred a project by Servpro (under a program and agreement whereby Mitnor and Servpro shared the revenue) such that Mitnor contracted for the demolition and/or dry-out and mitigation of water damage to certain properties located upon and/or owned by the University of North Carolina in Wilmington, (the "UNCW Project").

22.     Mitnor did not at that time have the equipment and technicians to produce the UNCW Project.

23.     Mitnor leased a substantial amount of the drying equipment and was provided related materials, fuel, and services (including technicians and their work product) by NDT for the UNCW Project.

24.     NDT provided back-up records of equipment used and services, and/or duly invoiced Mitnor for NDT's equipment and services furnished on the UNCW Project and pursuant to the original Rate and Service Agreement's terms and pricing. **See, Exhibit 1**.

25.     Mitnor has taken the information detailed in NDT's back-up records of equipment used and services, and/or NDT's invoicing, and submitted that to Mitnor's customer(s) on the UNCW Project as their own work product, and since received payments that were understood and intended to pay for the equipment and services

furnished by NDT.

26.     NDT has invoiced Mitnor a total of $4,037,947.72 for equipment and
services furnished upon the UNCW Project at Mitnor's request and direction.

27.     Mitnor has made payments against NDT's invoices and charges on the
UNCW Project (without protest) totaling $2,904,396.95 (the last payment was received
on July 2, 2020).

28.     After applying those payments received and credits, Mitnor owes NDT
the principal balance of $628,870.81 on the UNCW Project, and which amount has been
accruing interest at the original Rate and Service Agreement's term of 1.5% per month,
since forty-five (45) days after invoicing at the end of October 2018.

29.     NDT may also recoup its costs and attorneys' fees under the parties'
applicable agreement.

30.     In October 2018, Hurricane Michael caused substantial damage across
Florida and parts of Alabama.

31.     Mitnor was again referred a number of projects by Servpro (still under a
program and agreement whereby Mitnor and Servpro shared the revenue) such that
Mitnor contracted for the demolition and/or dry-out and mitigation of water damage to
at least six (6) properties located in Florida and one (1) in Alabama, (the "Hurricane
Michael Jobs.").

32.     The Hurricane Michael Jobs are listed by name and location as:

        a.      "Paradise Shores" located at 800 Highway 98, Mexico Beach,
                Florida.

    b.        "Marina Store" located at 3904 HWY 98, Mexico Beach, Florida.

    c.        "Summer Chase Condos" located at 25800 Perdido Beach Blvd., Orange Beach, Alabama.

    d.        "West End Harbor HOA" located at 4000 HWY 98, Mexico Beach, Florida.

    e.        "The Club Condos" located at 1320 HWY 98, Mexico Beach, Florida.

    f.        "Tranquil Harbor Condos" located at 3606 US-98, Mexico Beach, Florida.

    g.        "The Villas" located at 3706 Hwy 98, Mexico Beach, Florida.

33.    Once again, Mitnor did not at that time have the equipment and technicians to produce all seven (7) Hurricane Michael Jobs.

34.    Mitnor leased a substantial amount of the drying equipment and was provided related materials, fuel, and services (including technicians and their work product) by NDT for the Hurricane Michael Jobs.

35.    NDT provided back-up records of equipment used and services, and/or duly invoiced Mitnor for NDT's equipment and services furnished on the Hurricane Michael Jobs and pursuant to the original Rate and Service Agreement's terms and pricing. **See Exhibit 1**.

36.    Mitnor has taken the information detailed in NDT'S back-up records of equipment used and services, and/or NDT's invoicing, and submitted that to Mitnor's customer(s) on the Hurricane Michaels Jobs as their own work product, and since

received payments that were understood and intended to pay for the equipment and services furnished by NDT.

37.     NDT has invoiced Mitnor a total of $3,467,267.32 for equipment and services furnished for the Hurricane Michael Jobs at Mitnor's request and direction.

38.     Mitnor has made payments against NDT's invoices and charges on the Hurricane Michael Jobs (without protest) totaling $790,917.71 (the last payment was received on September 9, 2020).

39.     After applying those payments and credits, Mitnor owes NDT the principal balance of $2,215,286.02 on the Hurricane Michael Jobs, and which amount has been accruing interest at the original Rate and Service Agreement's term of 1.5% per month since forty-five (45) days from the first invoicing, starting in November 2018.

40.     NDT may also recoup its costs and attorneys' fees under the parties' applicable agreement.

41.     In late August/early September 2020, Tropical Storm Marco caused substantial damage across Louisiana and Alabama.

42.     Mitnor was again referred a number of projects by Servpro (still under a program and agreement whereby Mitnor and Servpro shared the revenue) such that Mitnor contracted for the demolition and/or dry-out and mitigation of water damage for at least one (1) property in Louisiana and Alabama, respectively, (the "Storm Marcos Jobs.").

43.     The Storm Marcos jobs are more particularly identified by name and address as:

    a.    "Best Western Plus" located at 1200 Pintail Street, Sulpher,

              Louisiana; and

    b.    "Crystal Towers Condos" located at 1010 West Beach Blvd., Gulf

              Shores, Alabama.

44.    Once again Mitnor did not at that time have the equipment and technicians to produce both Storm Marcos Jobs.

45.    Mitnor leased a substantial amount of the drying equipment and was provided related materials, fuel, and services (including technicians and their work product) by NDT for the Storm Marcos Jobs.

46.    NDT provided back-up records of equipment used and services, and/or duly invoiced Mitnor for NDT's equipment and services furnished on the Storm Marcos Jobs and pursuant to the second Service Agreement's terms and pricing. See Exhibit 2.

47.    Mitnor has taken the information detailed in NDT'S back-up records of equipment used and services, and/or NDT's invoicing, and submitted that to Mitnor's customer(s) on the Storm Marcos Jobs as their own work product, and since received payments that were understood and intended to pay for the equipment and services furnished by NDT.

48.    NDT has invoiced Mitnor a total of $1,109,583.26 for equipment and services furnished for the Storm Marcos Jobs at Mitnor's request and direction.

49.    Mitnor has made payments against NDT's invoices and charges on the Storm Marcos Jobs (without protest) totaling $414,362.95 (the last payment was received on July 8, 2021).

50.     Mitnor owes NDT the principal balance of $695,220.31 on the Storm Marcos Jobs, and which amount has been accruing interest at the second Service Agreement's term of 1.5% since 30 days from the last invoicing of October 29, 2020.

51.     NDT may also recoup its costs and attorneys' fees under the parties' applicable agreement.

52.     In late February 2021, a severe cold weather event caused substantial damage across Texas.

53.     Mitnor was again referred a number of projects by Servpro (still under a program and agreement whereby Mitnor and Servpro shared the revenue) under which Mitnor contracted for the demolition and/or dry-out and mitigation of water damage to at least three (3) properties in Texas (the "Texas Freeze Jobs.").

54.     The Texas Freeze Jobs are listed by name and location as:

    a.      "St. Ann Catholic" – located at 180 Samuel Blvd., Coppell, Texas;

    b.      "Holiday Warehouse" – located at 2819 W. 15th St., Plano, Texas;

    c.      "University of N. Texas" – located at 1155 Union Cir., Denton, Texas.

55.     Once again, Mitnor did not at that time have the equipment and technicians to produce the Texas Freeze Jobs.

56.     Mitnor leased a substantial amount of the drying equipment and was provided related materials, fuel, and services (including technicians and their work product) by NDT for the Texas Freeze Jobs.

57.     NDT provided back-up records of equipment used and services, and/or

duly invoiced Mitnor for NDT's equipment and services furnished on the Texas Freeze

Jobs and pursuant to the second Service Agreement's terms and pricing. See Exhibit 2.

58.     Mitnor has taken the information detailed in NDT's back-up records of

equipment used and services, and/or NDT's invoicing, and submitted that to Mitnor's

customer(s) on the Texas Freeze Jobs as their own work product, and since received

payments that were understood and intended to pay for the equipment and services

furnished by NDT.

59.     NDT has invoiced Mitnor a total of $236,476.97 for equipment and

services furnished for the Texas Freeze Jobs at Mitnor's request and direction.

60.     Mitnor has not made any such payments against NDT's invoices and

charges on the Texas Freeze Jobs.

61.     Mitnor owes NDT the principal balance of $236,476.97 on the Texas Freeze

Jobs, and which amount has been accruing interest at the second Service Agreement's

term of 1.5% per month starting 30 days after the first invoicing of March 2021.

62.     NDT may also recoup its costs and attorneys' fees under the parties'

applicable modified agreement.

63.     In June of 2021, the Morten West High School located at 2400 Home

Avenue in Berwyn, Illinois suffered property damage requiring water mitigation and

dry-out services.

64.     Once again, Mitnor was referred this project by Servpro (still under a

program and agreement whereby Mitnor and Servpro shared the revenue) under which

Mitnor contracted for the demolition and/or dry-out of the Morten West High School

(the "Morten West High School Job").

65.     Once again, Mitnor did not at that time have the equipment and technicians to produce the Morten West High School Job.

66.     Mitnor leased a substantial amount of the drying equipment and was provided related materials, fuel, and services (including technicians and their work product) by NDT for the Morton West High School Job.

67.     NDT provided back-up records of equipment used and services, and/or duly invoiced Mitnor for NDT's equipment and services furnished on the Morton West High School job and pursuant to the second Service Agreement's terms and pricing. **See Exhibit 2**.

68.     Mitnor has taken the information detailed in NDT'S back-up records of equipment used and services, and/or NDT's invoicing, and submitted that to Mitnor's customer(s) for the Morton West High School Job as their own work product, and since received payments that were understood and intended to pay for the equipment and services furnished by NDT.

69.     NDT has invoiced Mitnor a total of $71,706.88 for equipment and services furnished for the Morton West High School Job at Mitnor's request and direction.

70.     Mitnor has not made any such payments against NDT's invoices and charges on the Mortan West High School Job.

71.     Mitnor owes NDT the principal balance of $71,706.88 on the Morton West High School Job, and which amount has been accruing interest at the second Service Agreement's term of 1.5% per month starting 30 days after the first invoicing of July 15,

2021.

72. NDT may also recoup its costs and attorneys' fees under the parties' applicable modified agreement.

73. There are no conditions precedent to NDT's right of payment from Mitnor under the original Rate and Service Agreement, nor under the second Service Agreement.

74. NDT has fully performed its covenants of performance by lease of equipment and furnishing of other goods, materials, consumables, and services (including technicians) to Mitnor under the parties' applicable agreements and/as otherwise furnished to Mitnor for the at issue jobs and projects.

75. Mitnor owes NDT the principal sum of $3,847,560.99 combined for Mitnor's leasing of drying equipment and related services on the UNCW Project, the Hurricane Michael Jobs, the Storm Marcos Jobs, the Texas Freeze Jobs, and the Morton West High School job.

76. Mitnor owes NDT in excess of $2.475 million on its open account balance(s) in accrued interest at the contracts' 1.5% monthly rate.

77. NDT may also recoup its costs and attorneys' fees as a prevailing party under the parties' applicable agreements.

78. Upon information and belief, Defendant, by and through itself and/or its agents, intimated acknowledgment of the at issue debt and of a willingness to pay, in whole or in part, through communications with Plaintiff or its agents, intermittently in or around 2018 through 2022.

79.     Upon information and belief, Plaintiff did not discover the true and full extent of the damages and/or its likely cause as alleged herein until at least late October 2019.

## COUNT I

## BREACH OF CONTRACTS

80.     NDT hereby incorporates the allegations and exhibits of the preceding paragraphs as if fully recited here.

81.     NDT and Mitnor formed and/or ratified the original **"Rate and Service Agreement" (Exhibit 1)** in 2018 for Mitnor's leasing of equipment and related services from NDT on the UNCW Project and the Hurricane Michael Jobs. The Rate and Service Agreement, together with the attendant documents corresponding thereto, constitutes a valid, binding contract that existed between the parties.

82.     NDT fully performed its obligations and duties under the Rate and Service Agreement, including by providing the equipment, materials, and services as prescribed and contemplated therein in manner and scope.

83.     Mitnor failed to honor its obligations and otherwise breached its contractual obligations, without legal excuse, including by failing to transmit the payments in the amounts and timeline as required by contract and applicable law.

84.     As a direct and proximate result of Mitnor's breach of its contractual obligations owed to NDT, NDT has suffered and will continue to suffer substantial harm, including expenses, costs and fees incurred.

85.     Facts bearing on the aforementioned include, e.g., the following:

86.     NDT leased equipment and related services to Mitnor pursuant to that contract on the UNCW Project for which the principal amount outstanding is $628,870.81.

87.     NDT has demanded Mitnor's payment of that amount.

88.     Mitnor is in default under the contract for non-payment and NDT may recoup the balance outstanding thereunder, plus 1.5% monthly interest, costs, and attorneys' fees.

89.     Mitnor has received payments from its customer(s) for NDT's equipment and services furnished on the UNCW Project that it has failed to remit to NDT after seven (7) days of Mitnor's receipt.

90.     NDT leased equipment and related services to Mitnor pursuant to that contract on the Hurricane Michael Jobs for which the principal amount outstanding is $2,215,286.02.

91.     NDT has demanded Mitnor's payment of that amount.

92.     Mitnor is in default under the contract for non-payment and NDT may recoup the balance outstanding thereunder, plus 1.5% monthly interest, costs, and attorneys' fees.

93.     Mitnor has received all documentation required for its customers' release of monies to Mitnor to pay for the Hurricane Michael Jobs.

94.     Mitnor has received payments from its customer(s) for NDT's equipment and services furnished on the Hurricane Michael Jobs.

95.     Mitnor has failed to remit payments to NDT more than fifteen (15) days

after Mitnor's receipt of NDT's demand for payment, and more than fifteen (15) days after Mitnor's receipt of payment from Mitnor's customers for the NDT equipment and services furnished to the Hurricane Michaels Projects.

96.    NDT and Mitnor modified the original terms of their contract by their formation of the second **"Service Agreement." (Exhibit 2)**. The Service Agreement, together with the attendant documents corresponding thereto, constitutes a valid, binding contract that existed between the parties.

97.    NDT fully performed its obligations and duties under the Service Agreement, including by providing the equipment, materials, and services as prescribed and contemplated therein in manner and scope.

98.    Mitnor failed to honor its obligations and otherwise breached its contractual obligations, without legal excuse, including by failing to transmit the payments in the amounts and timeline as required by contract and applicable law.

99.    As a direct and proximate result of Mitnor's breach of its contractual obligations owed to NDT, NDT has suffered and will continue to suffer substantial harm, including expenses, costs and fees incurred.

100.    Facts bearing on the aforementioned include, e.g., the following:

101.    NDT leased equipment and related services to Mitnor pursuant to that contract on the Storm Marcos Jobs for which the principal amount outstanding is $695,220.31.

102.    NDT has demanded Mitnor's payment of that amount.

103.    Mitnor is in default under the contract for non-payment and NDT may

recoup the balance outstanding thereunder, plus 1.5% monthly interest, costs, and attorneys' fees.

104.    Mitnor has received payments from its customer on the Best Western Plus project that were understood and intended to pay for the equipment and services furnished by NDT on that project, which Mitnor has failed to pay over to NDT after fifteen (15) days of their receipt of those monies.

105.    Mitnor has received payments from its customer on the Crystal Towers Condos that were understood and intended to pay for the equipment and services furnished by NDT on that project, which Mitnor has failed to pay over to NDT after seven (7) days of their receipt of those monies.

106.    NDT leased equipment and related services to Mitnor pursuant to that contract on the Texas Freeze Jobs for which the principal amount outstanding is $236,476.97.

107.    NDT has demanded Mitnor's payment of that amount.

108.    Mitnor is in default under the contract for non-payment and NDT may recoup the balance outstanding thereunder, plus 1.5% monthly interest, costs, and attorneys' fees.

109.    Mitnor has received payments from its customer on the Texas Freeze Jobs that were understood and intended to pay for the equipment and services furnished by NDT on that project, which Mitnor has failed to pay over to NDT after seven (7) days of their receipt of those monies.

110.    NDT leased equipment and related services to Mitnor pursuant to that

contract on the Morten West High School job for which the principal amount outstanding is $71,706.88.

111.    NDT has demanded Mitnor's payment of that amount.

112.    Mitnor is in default under the contract for non-payment and NDT may recoup the balance outstanding thereunder, plus 1.5% monthly interest, costs, and attorneys' fees.

113.    Mitnor has received payments from its customer on the Morten West High School job that were understood and intended to pay for the equipment and services furnished by NDT on that project, which Mitnor has failed to pay over to NDT within fifteen (15) days after their receipt of those monies.

114.    Moreover, the account balance bears certain statutory interest rates reasonably invoked by the aforementioned allegations, and NDT may recoup its costs and attorneys' fees under those statutes as well.

115.    Related thereto, state statutes reasonably invoked by the contractor relationship and acts between and involving Mitnor, NDT, and Mitnor's customers in those states corresponding to the specific jobs enumerated above, include, e.g., the following statutory obligations.

116.    Pursuant to Fl. Stat. Ch. 715.12, all payments received from Mitnor's customers that were not paid over in full (or partial satisfaction) of the $2,215,286.02 balance bear interest at the 24% per annum since that fifteenth day.

117.    Pursuant to Fl. Stat. Ch. 713.346, NDT has a right to an accounting for payments Mitnor received from its customers on the Hurricane Michaels Jobs, and for a

prevailing party award of costs and attorneys' fees.

118.    Pursuant to LI Rev. Stat. Sec. 9:2784, all payments received from Mitnor's customers that were not paid over in full (or partial satisfaction) of the $211,531.27 Best Western Plus balance bear interest at the rate of 1.5% per day (since that fifteenth day) but not to exceed $31,729.65 (15% of the contract balance), and Mitnor is liable to NDT for its costs of collection, including attorneys' fees.

119.    Pursuant AL Stat. Secs. 8-29-3 and 8-29-6, all payments received from Mitnor's customers that were not paid over in full (or partial satisfaction) of the $483,689.04 Crystal Towers Condos balance bear interest at the rate of 1% per month, and Mitnor is liable to NDT for its costs of collection of those monies, including attorneys' fees.

120.    Pursuant to TX Stat. Title 4, Chap. 28.004 and 20.005, all payments received from Mitnor's customers that were not paid over in full (or partial satisfaction) of the $483,689.04 Crystal Towers Condos balance bear interest at the rate of 1.5% per month, and Mitnor is liable to NDT for its costs of collection of those monies, including attorneys' fees.

121.    Pursuant to Chapter 815 of the Illinois Compiled Stat., Sec. 603/5, all payments received from Mitnor's customers that were not paid over in full (or partial satisfaction) of the $71,706.88 Morton West High School job's balance bear interest at the rate of 10% per annum.

122.    Mitnor is liable to NDT for the agreed upon payments owed for the equipment, materials and services NDT provided, including the contractually and

statutorily imposed attendant interests, expenses, costs, and fees accrued.

## COUNT II

## ACTION ON ACCOUNT STATED

123.    NDT hereby incorporates the allegations and exhibits of the preceding paragraphs as if fully recited here.

124.    NDT has stated the account balances for all projects and jobs at issue in this action in the original bargained amount and/or in the reduced amount(s) (by payments and credits) the total of $3,847,560.99 as the combined principal outstanding balance for NDT leased equipment, materials, goods, and services by Mitnor.

125.    In its invoicing and follow up communications to Mitnor, NDT has stated the original bargained price that has been reduced by payments and credits to the current account balance for the UNCW Job of $628,870.01.

126.    In its invoicing and follow up communications to Mitnor, NDT has stated the original bargained price that has been reduced by payments and credits to the current account balance for the Paradise Shores Job of $215,111.

127.    In its invoicing and follow up communications to Mitnor, NDT has stated the original bargained price that has been reduced by payments and credits to the current account balance for the Marina Store Job of $72,490.83.

128.    In its invoicing and follow up communications to Mitnor, NDT has stated the original bargained price that has been reduced by payments and credits to the current account balance for the Summer Chase Condos Job of $427,268.39.

129.    In its invoicing and follow up communications to Mitnor, NDT has stated

the original bargained price that has been reduced by payments and credits to the current account balance for the West End Harbor HOA Job of $270,065.13.

130.    In its invoicing and follow up communications to Mitnor, NDT has stated the original bargained price that has been reduced by payments and credits to the current account balance for The Club Condos Job of $989,760.51.

131.    In its invoicing and follow up communications to Mitnor, NDT has stated the original bargained price that has been reduced by payments and credits to the current account balance for Tranquil Harbors Job of $25,788.85.

132.    In its invoicing and follow up communications to Mitnor, NDT has stated the original bargained price that has been reduced by payments and credits to the current account balance for The Villas Job of $214,801.31.

133.    In its invoicing and follow up communications to Mitnor, NDT has stated the original bargained price that has been reduced by payments and credits to the current account balance for Best Western Plus Job of $211,531.31.

134.    In its invoicing and follow up communications to Mitnor, NDT has stated the original bargained price that has been reduced by payments and credits to the current account balance for Crystal Towers Condos Job of $483,689.04.

135.    In its invoicing and follow up communications to Mitnor, NDT has stated the original bargained price that has been reduced by payments and credits to the current account balance for St. Anne Catholic Job of $3,397.50.

136.    In its invoicing and follow up communications to Mitnor, NDT has stated the original bargained price that has been reduced by payments and credits to the

current account balance for the Holiday Warehouse Job of $153,765.37.

137.    In its invoicing and follow up communications to Mitnor, NDT has stated the original bargained price that has been reduced by payments and credits to the current account balance for University of North Texas Job of $79,314.10.

138.    In its invoicing and follow up communications to Mitnor, NDT has stated the original bargained price that has been reduced by payments and credits to the current account balance for the Morton West High School Job of $71,706.88.

139.    Mitnor has by word, deed and/or conduct assented to those accounts stated in its:

      a.    Partial payments against the account balances;

      b.    Receipt, review, and use (subsuming) of the quantities and/or charges of NDT for those accounts into Mitnor's invoicing to its customers;

      c.    Failing to protest the charges within a seasonable/reasonable time.

140.    Mitnor is liable to NDT for the acknowledged payments owed in the amounts and manner assented to as described above.

141.    Moreover, the accounts stated by NDT to Mitnor bear 1.5% per month/18% per annum interest, and NDT may recoup its costs of collection and including attorneys' fees.

## COUNT III

## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

142.    NDT hereby incorporates the allegations and exhibits of the preceding

paragraphs as if fully recited here.

143.    The Rate and Service Agreement, and the Service Agreement, together with each of the corresponding documents and attendant promises, conferred an implied covenant of good faith and fair dealing by which the parties were bound.

144.    Each of the implied covenants requires and required Defendant as a party to said contractual relationship, to refrain from unreasonable conduct which has the effect of preventing the other party, here as applicable, Plaintiff, to the contract from receiving the fruits of the bargain—yet Defendant failed to do so in each such instance alleged herein.

145.    Such implied covenant requires the parties to act in good faith and fairly with one another.

146.    Mitnor has breached its implied covenant of good faith and fair dealing, by, among other things, at Mitnor's coordination and design, invoicing and improperly retaining payments made by its customers for the equipment and services NDT provided at Mitnor's request and direction, in the manner described herein. Moreover, rather than pay the amounts owed, Mitnor engaged in a series of protracted communications and obfuscation, intimating potential payment and informational clarifications, which never came.

147.     By the conduct and salient payment-related provisions as discretionarily performed in the manner alleged herein, appearing in Exhibits 1 and 2, Mitnor's surrounding misconduct belies the parties' reasonable expectations of the contracts at the time of execution, including the agreed-upon common purpose and as well as

common standards of decency, fairness, and reasonableness.

148.    Mitnor is liable to NDT for the agreed upon payments owed for the

equipment, materials and services NDT provided, including the contractually and

statutorily imposed attendant interest, expenses, costs, and fees accrued.

## COUNT IV

### UNJUST ENRICHMENT
### (in the Alternative)

149.    NDT hereby incorporates the allegations and exhibits of the preceding

paragraphs as if fully recited here.

150.    As set forth above, NDT conferred a measurable benefit upon Mitnor

through the equipment and services provided.

151.    NDT provided these benefits to Mitnor with the reasonable expectation of

receiving payments in the amounts and timeline promised.

152.    Mitnor ordered and accepted the lease of NDT's equipment, materials,

and services with an express and/or implied promise to pay NDT the reasonable value

for those goods, equipment and services furnished and rendered.

153.    The reasonable value of NDT's equipment, materials and services is at

least equal to if not greater that the marked-up value that Mitnor charged its customers

for NDT's equipment, materials and services rendered on the jobs detailed *supra*.

154.    Mitnor has received and appreciated the benefits of the NDT leased

equipment, materials and services furnished on an account, and including by receipt

and use of the Customers' payments issued to pay for that equipment used, materials

delivered and services rendered on account by NDT.

155.    The reasonable value of NDT's equipment used, materials delivered and services that it rendered to Mitnor on an account, combined and outstanding, is $3,847,560.99.

156.    Mitnor has been unjustly enriched by the dishonor of its promise to pay NDT the reasonable value of NDT's equipment used, materials delivered and serviced that were rendered on an account to Mitnor.

157.    It would be against equity and good conscious for Mitnor to retain the benefits conferred by NDT with respect to the equipment and services furnished, through the wrongful acts and/or passive acceptance of such benefits, including its value and the payments received from Mitnor's customers not paid to NDT.

158.    Mitnor had an appreciation or knowledge of this benefit received, and unjustly accepted and retained it.

159.    Upon information and belief, certain of such benefits received were outside the scope of the valid and existing contracts alleged.

160.    Mitnor is liable to NDT for restitution and/or disgorgement from Defendant of all unjustly received benefits, including but not limited to, payments received from Defendant's customers for equipment and services performed by Plaintiff, profits, and/or the reasonable value of equipment used, materials delivered and services rendered, combined and outstanding.

**COUNT V**

**PROMISSORY ESTOPPEL/DETRIMENTAL RELIANCE**

161.    NDT hereby incorporates the allegations and exhibits of the preceding paragraphs as if fully recited here.

162.    NDT reasonably relied on Mitnor's promises and assurances of timely and adequate performance and payment, in exchange for the equipment, materials and services provided, for which reliance was to NDT's ultimate detriment, including expenses, costs and fees incurred.

163.    Mitnor reasonably expected or intended NDT to act in reliance on the aforementioned promises and assurances, and NDT acted reasonably in reliance thereon.

164.    Mitnor must be estopped from further dishonor of its promises to pay NDT, including the reasonable value of equipment used, materials delivered and serviced rendered on Mitnor's account that remain unpaid.

165.    Mitnor is liable to NDT for expectation damages, reliance damages, and/or specific performance.

166.    Moreover, the account balance bears statutory interest rates as recited heretofore, and NDT may recoup its costs and attorneys' fees under those statutes.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, National Drying Technologies, LLC, respectfully requests that the Court:

A.    Enter Judgment against Defendant for the total amount of principal of

$3,847,560.99;

B.      Enter Judgment against Defendant for the total amount of accrued interest in an amount of at least $2.475 million;

C.      Award all additional consequential, reliance or expectation, enhanced compensatory, and punitive damages, to the greatest extent allowed by applicable law in an amount to be determined;

D.      Award all other contract and statutory interests, fees, costs, and litigation expenses, as allowed by law;

E.      Award prejudgment interest on all amounts awarded;

F.      Award restitution and/or disgorgement from Defendant all unjustly received benefits, including but not limited to, payments received from Defendant's customers for equipment and services performed by Plaintiff, profits, and/or the reasonable value of equipment used, materials delivered and services rendered, combined and outstanding;

G.      Order an Accounting from Defendant of all amounts collected from Defendant's customers for the equipment, materials and services provided by NDT, and the amounts paid versus owed to NDT; and

H.      Such further relief as the Court deems just and proper.

## REQUEST FOR BENCH TRIAL

Plaintiff respectfully requests a bench trial on all issues so triable.

Dated: October 12, 2022

Respectfully submitted,

/s/ Benjamin P. Lajoie
Benjamin P. Lajoie
BAILEY GLASSER LLP
Attorney Bar No. 021286
blajoie@baileyglasser.com
176 Federal Street, 5th Floor
Boston, MA 02110
617.439.6730

*Attorney for Plaintiff National Drying
Technologies, LLC*